J-S29031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3340 EDA 2016 |

Appeal from the Decree September 16, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000784-2015,
CP-51-DP-0001909-2013, FID: 51-FN-465818-2009

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.K.W.,  A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3341 EDA 2016 |

Appeal from the Decree September 16, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000786-2015,
CP-51-DP-0001907-2013, FID: 51-FN-465818-2009

J-S29031-17

| IN THE INTEREST OF: K.D.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: D.R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3342 EDA 2016 |

Appeal from the Decree September 16, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000785-2015,
CP-51-DP-0001908-2013, FID: 51-FN-465818-2009

BEFORE:   LAZARUS, J., SOLANO, J., and STEVENS. P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MAY 26, 2017**

Appellant, D.R.W. ("Father"), files this appeal from the decrees entered September 16, 2016, in the Philadelphia County Court of Common Pleas by the Honorable Joseph Fernandes, granting the petitions of the Department of Human Services ("DHS") and involuntarily terminating his parental rights to Y.K.W., born in February of 2013, K.D.W., born in November of 2008, and I.T.W., born in January of 2010 (collectively, the "Children"), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1, 2]

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By separate decrees entered the same date, the trial court involuntarily terminated the parental rights of K.I.H. ("Mother") with respect to the Children.  Mother filed separate appeals at Superior Court Docket Nos. 3207-3208-3209 EDA 2016, consolidated and addressed by separate memorandum.

- 2 -

Father further appeals the orders entered September 16, 2016, changing

Children's permanency goal to adoption pursuant to the Juvenile Act, 42

Pa.C.S. § 6351.[3]  After review, we affirm the trial court's decrees and orders.

The trial court summarized the relevant procedural and factual history,

in part, as follows:

> The family in this case became known to DHS on February 28, 2013,[4] when DHS received a General Protective Services report that [K.I.H.] ("Mother") had just given birth, was using drugs and had not been attending prenatal care.  DHS visited Mother in

_(Footnote Continued)_ ───────────────

[2] While on the record at the conclusion of the hearing, the trial court indicated termination of Father's parental rights under subsections (a)(1), (2), and (b) only, the decrees additionally included subsections (a)(5) and (8).  We would disagree as to the application of Section 2511(a)(5) and (8), as the Children were not removed from Father's care.  **See In re C.S.**, 761 A.2d 1197, 1200 n.5. (Pa. Super. 2000) (_en banc_).  **See also In re Z.P.**, 994 A.2d 1108, 1123 n.3 (Pa. Super. 2010.)

[3] Father, however, failed to preserve a challenge related to the goal change by failing to raise the issue in the statement of questions involved section of his brief and by failing to present argument related thereto in his brief.  As such, we find that Father has waived any claim regarding the goal change. **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), _appeal denied_, 24 A.3d 364 (Pa. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa. Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

[4] DHS was previously involved with respect to an older child of Mother's who is not the subject of the instant appeals.  Notes of Testimony ("N.T."), 9/16/16, at 67-70.

her home, and Mother accepted In-Home Protective Services. These services were conditioned on Mother providing drug screens, which she repeatedly failed to provide. On September 5, 2013, DHS received a report that Mother continued to use drugs in the home, that there was no food in the home and that the conditions were filthy. D.R.W. ("Father") was not involved in the care of the Children, and was incarcerated. On September 17, 2013, DHS filed an urgent petition and removed the Children from the home. The Children were adjudicated dependent on October 2, 2013, and fully committed to DHS custody. DHS then developed a Family Service Plan ("FSP") with objectives for Father. Between 2013 and 2015, Father did not complete his objectives. On November 3, 2015, DHS filed petitions to terminate Father's parental rights.

Trial Court Opinion ("T.C.O."), 12/6/16, at 1-2 (citations to record omitted).

On November 3, 2015, DHS filed petitions to involuntarily terminate parental rights, and to change Children's permanency goal to adoption. The trial court conducted a combined termination and goal change hearing on September 16, 2016. In support thereof, DHS presented the testimony of the following: Brian Bell, former DHS social worker; Sherry Woods, former case supervisor, First Home Care, the agency through which the Children are placed; and Tyrone King, current DHS social worker. In addition, Father testified on his own behalf via telephone from SCI-Mercer.[5] Mother was present and testified on her own behalf as well.

---

[5] The trial court took Father's testimony out of turn in order to avoid any issue with the correctional facility and availability, and, following the completion of his testimony, advised Father he could stay on the line as long the correctional facility allowed. N.T. at 16-17, 48, 64. Father remained on the line throughout the remainder of the proceedings. *Id.* at 176.

- 4 -

Following the hearing, on September 16, 2016, the trial court entered decrees involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and orders changing the Children's permanency goal to adoption.[6]  On October 17, 2016, Father, through appointed counsel, filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on November 10, 2016.

On appeal, Father raises the following issues for our review:

A. Whether the court erred in failing to find that for the six months immediately preceding the filing of the petition, when appellant Father's child was bonded with him, made his whereabouts known to DHS/CUA [("Community Umbrella Agency")], completed parenting and violence prevention classes, and appellant Father did not intend to relinquish his claim to his child or refused and/or failed to perform parental duties, and when DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care.

B.    Whether the court erred in failing to find that for the six months immediately preceding the filing of the petition appellant Father had contact with his child, and appellant Father's child was bonded with him made his whereabouts known to DHS/CUA, completed parenting and violence prevention classes, and when

---

[6] This order memorialized the decision placed by the court on the record at the conclusion of the hearing.  As indicated above, while the trial court indicated termination of Father's parental rights under subsections (a)(1), (2), and (b) only on the record, the decrees subsequently issued additionally included subsections (a)(5) and (8).

DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care.

C.      Whether the court erred in finding that there were repeated and continued findings of incapacity, abuse, neglect and/or dependency of this minor child by appellant Father, when appellant Father's child was bonded with him, made his whereabouts known to DHS/CUA, completed parenting and violence prevention classes, and when DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care.

D.      Whether the court erred in finding that the conditions which led to the removal or placement of the child continue to exist, when appellant Father's child was bonded with him, made his whereabouts known to DHS/CUA, completed parenting and violence prevention classes, and when DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care.

E.      Whether the court erred in finding that the conditions which led to the removal or placement of the children continue to exist and termination of parental rights would best serve the needs and welfare of the child, when appellant Father can remedy the conditions within a reasonable period of time, and when Father's child was bonded with him, made his whereabouts known to DHS/CUA, completed parenting and violence prevention classes, and appellant Father did not intend to relinquish his claim to his child or refused and/or failed to perform parental duties, and when DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care.

F.      Whether the court erred in finding that DHS made, reasonable efforts towards reunification, by either failing and/or refusing to help find a viable option or to consider options other

than terminating Father's parental rights, when Father's child was bonded with him, made his whereabouts known to DHS/CUA, completed parenting and violence prevention classes, and appellant Father did not intend to relinquish his claim to his child or refused and/or failed to perform parental duties, and when DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care.

G.      Whether the court erred in terminating the rights of appellant Father, when the reasons he was unable to obtain housing, and provide medical care [sic] for the care and maintenance of the child, was his incarceration and current lack of resources.

H.      Whether the court erred in terminating the rights of appellant Father where it was not supported by clear and convincing evidence and not in the best interests of the child, and there was a bond between appellant Father and child, made his whereabouts known to DHS/CUA, completed parenting and violence prevention classes, and appellant Father did not intend to relinquish his claim to his child or refused and/or failed to perform parental duties, and when DHS/CUA failed and/or refused to help [F]ather maintain contact with his child and to inform [F]ather of his objectives or to acknowledge that Father completed objectives that had not even been set for him, and when child was removed from Mother's care, and where the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of the child, pursuant to [Pa.C.S.] Section 2511(b).

I.      Whether errors committed by the court below deprived appellant of his rights to due process and equal protection under the law.

Father's Brief at 3-4 (unnecessary capitalization omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and

- 7 -

credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

***In re T.S.M.***, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d at 1201 (quoting *Matter of Adoption of Charles E.D.M. II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, with his first through fifth, seventh, and eighth issues, Father essentially challenges the sufficiency of the evidence in terminating his parental rights. Father's Brief at 9-16. The trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination order pursuant to subsections 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first examine the court's termination of Father's parental rights under Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to

- 10 -

perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

In *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817 (2012), our Supreme Court, in addressing Section 2511(a)(2), concluded that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *Id.* at 328-29, 47 A.3d at 828. *See also In re D.C.D.*, 629 Pa. 325, 346-47, 105 A.3d 662, 675 (2014) (holding that the father's incarceration prior to the child's birth and until the child is at least age seven renders family reunification an unrealistic goal. As such, the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow the court's initial directive that reunification efforts be made). The Court in *S.P.* further stated,

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.,* [511 Pa. 590, 605,] 515 A.2d [883, 891 (1986)] ("[A] parent who is incapable of

- 11 -

performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [**In re**] **E.A.P.,** 944 A.2d [79, 85 (Pa. Super. 2008)](holding termination under § 2511(a)(2) was supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

**In re Adoption of S.P.**, 616 Pa. at 331-32, 47 A.3d at 830 (footnote omitted).

In the instant matter, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court concluded:

Father was incarcerated for the life of this case. Father knew the Children were in care, and had contact information for DHS. DHS mailed Father a copy of his FSP, and invited him to be present by phone for an FSP meeting. Father sent his sister to the meeting instead. Father's sole contact with DHS was a letter Father sent to the agency, stating that he would not voluntarily relinquish his parental rights. Father testified that he took parenting classes in prison, as required by his FSP. DHS has been unable to confirm that Father successfully completed the classes, and Father has never provided documentation. Father never contacted the agency and never asked to set up visits with the Children. Father has not seen or had any contact with the Children in four years. He has never met [Y.K.W.]. Father does not have a release date, and may serve up to four more years in prison. He has been denied parole in the past. Father testified that he lived with Mother and the Children before he was imprisoned, and performed all parental duties. He took the Children to medical appointments and excursions to the park. Since he was imprisoned, Father has not contacted the Children or parented them in any way. Father did not express any desire to see the Children or contact them, unless he was released from prison. Father has conditioned his willingness to parent on his imprisonment status, and if he is not released he will continue to be uninvolved. Father has demonstrated the he has refused to perform parental duties, and will not remedy this condition. Additionally, even if Father is released on parole, Father would still need to provide documentation of the parenting classes,

- 12 -

appropriate housing, employment or job training, and create a relationship with the Children by attending visits. Because the trial court heard clear and convincing evidence to this effect, termination under this section was proper.

T.C.O. at 5-6 (citations to record omitted).

Father argues that he made attempts to maintain contact with the Children and to prepare to provide for them and assume his parental duties. He, however, contends that DHS failed to assist with efforts towards reunification. Father's Brief at 13-14. Father states,

In the instant matter, appellant Father planned and prepared to care for his children and to uphold his parental responsibilities. He has made and continues to try to maintain communication and contact with and to play a role in his children's life and has a bond with his children. He has shown continued positive intent in establishing a home for himself and his children and assuming parental responsibilities.

It appears DHS did not make, [sic] reasonable efforts towards outreach to Father and reunification, by either failing and/or refusing to arrange for visits and with his children, exploring reunification and reunification arrangements with Father. DHS has failed to prove by clear and convincing evidence that grounds exist to terminate parental rights, under § 2511(a)(2).

*Id.* at 14. We disagree.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Significantly, Father has been incarcerated since June 2012, prior to Y.K.W. even being born. N.T. at 56. Although Father indicated that he regularly saw I.T.W. and K.D.W.

before his incarceration, he has not seen or had any contact with the Children in the over four years since.[7] In fact, Father has never even met Y.K.W. *Id.* at 50, 56-57. Moreover, it was not until 2015 that Father sent correspondence to DHS expressing his desire for visitation with the Children.[8] *Id.* at 98, 100.

Father was sentenced to four to eight years' imprisonment. He testified that his release date is unknown and acknowledged that he may serve up to another four years in prison.[9] *Id.* at 53, 57. Further, it is speculative whether Father will then, or ever, be in a position to care for the Children.[10] This prospect is simply unacceptable for the Children, who have already been in the custody of DHS for three years as of the time of the

---

[7] While Father testified that he made very little money while incarcerated and, therefore, provided no financial support to the Children, he testified that he sent Christmas gifts for the Children to maternal great-grandmother every year. *Id.* at 60.

[8] It is unclear whether this request was in the one letter Father sent directly to former DHS social worker, Brian Bell, or whether it was a letter forwarded to Mr. Bell by counsel. N.T. at 98, 100. Mr. Bell did not take any action as the case was transferred. *Id.* at 110. Notably, current DHS social worker, Tyrone King, testified that was unaware of any request for visitation and received no correspondence from Father. *Id.* at 124.

[9] A parole hearing was scheduled for February 2017. Father conceded that he had been denied parole previously. *Id.* at 61-62.

[10] At the hearing, Father presented certificates of completion of parenting and violence prevention classes while in prison. *Id.* at 53-54. *See also* Father's Exhibit F-1. Father further testified to having a residence with his fiancée upon his release. *Id.* at 52-53, 60-61.

hearing. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional

bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in reasoning that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated:

Father has had no contact of any kind with any of the Children since he was imprisoned four years ago. Father has not attempted to set up visits, despite having DHS's contact information. Father has never met [Y.K.W.]; Father was incarcerated when [Y.K.W.] was born. The Children do not have any positive relationship with Father. The Children have no contact with Father. They would suffer no irreparable harm if Father's parental rights were terminated. The Children are currently in a pre-adoptive home. The Children feel "right at home" and have adjusted very well. The Children now look to the foster parent for all their needs. The foster parent has a wonderful, loving bond with all the Children. The Children are currently the happiest they have ever been, and are better behaved than at any prior time in the life of the case. The Children see the foster parent as their mom, and it is in their best interest to be adopted. DHS's witnesses were unwavering and credible, and Father corroborated their testimony. Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive, beneficial parent-child bond with Father, and that termination of Father's parental rights would not destroy an existing beneficial relationship.

Father alleges on appeal that the trial court cannot terminate his parental rights under Section 2511(b) because his inability to parent was caused by environmental factors beyond his control. The trial court did not terminate Father's rights on the basis of the kind of environmental factors enumerated in the statute. As discussed above, the trial court terminated Father's parental rights mainly because of his complete lack of involvement in the lives of the Children. In fact, Father had been totally uninvolved in the Children's lives even before they came into care. He committed crimes of his own volition, resulting in his imprisonment. He did not make any efforts to contact the Children, either by having visits, phone calls or letters and gifts. The causes of Father's incapacity were well within Father's own control. Father refused to perform parental duties, and to build

- 17 -

and sustain a parental bond with his Children. The trial court did not err in terminating Father's parental rights.

T.C.O. at 9.

Father, however, argues a lack of evidence suggesting a bond no longer exists between him and the Children. Father's Brief at 16. Father further highlights a lack of evidence as to the impact on the Children of dissolving any such bond, stating, "Without any evidence of the impact that termination would have on the child, a court cannot conduct a subsection (b) analysis." *Id.* He continues, "There was no testimony by an expert as to the best interests of the [Children], as to the [Children]'s physical, intellectual, moral, and spiritual well-being. There was no expert testimony as to the relationship, interaction, and bonding between Father and [the Children]." *Id.* Again, we disagree.

Here, the record likewise corroborates the trial court's termination orders pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Children's needs and welfare, and as to the existence of a bond between Father and the Children that, if severed, would not have a detrimental impact on them. The Children have not seen or had contact with Father since his incarceration in June 2012. In fact, Y.K.W., who was not yet born at the time, has never even met Father. N.T. at 50, 56-57. While Father requested visitation, according to the testimony of former DHS social worker, Brian Bell, this was not until 2015. *Id.* at 100. Further, Mr. Bell stated that, although ultimately up to the

courts, given the young age of the Children and their behavior problems and other issues, he did not think visitation was appropriate.[11, 12] *Id.* In addition, Mr. Bell indicated that when he met with the Children they did not talk about Father. *Id.* at 99. As a result, Mr. Bell, noting the Children's lack of "interaction" with Father, stated that the Children would not experience irreparable harm if Father's parental rights were terminated. *Id.* at 102.

Moreover, and more importantly, the Children are in a pre-adoptive home where they are doing well and have formed a positive relationship with their foster mother. As expressed by Sherry Woods, former case supervisor for the provider agency, the Children are "right at home" in foster mother's home and "look[] to foster mother to take care of their needs." *Id.* at 33. When asked to describe the interaction between the Children and their foster mother, Ms. Woods observed, "It's great. The kids are complete [sic] attached to her and the bond that they have is just amazing. And I see the love that she has for those kids and the patience that she has with them." *Id.* at 36. Similarly, Mr. Bell indicated, "The children are happy. They have chores. They do well. . . . It appears the children are exceling more in

---

[11] As noted above, Mr. Bell did not take any action as to the request for visitation, as the case was transferred, and current DHS social worker, Tyrone King, testified that was unaware of any request for visitation and received no correspondence or contact from Father. *Id.* at 110, 124.

[12] K.D.W. and I.T.W. are diagnosed with attention deficit hyperactivity disorder ("ADHD") and attending individual therapy. *Id.* at 100.

everything. Less problems in school. Medical appointments are kept. And they're speaking more, verbalizing more. The children just appear to be in a much better place. I mean, emotionally and physically where they're currently at." *Id.* at 104. Likewise, current DHS social worker, Tyrone King, stated, "Based on my opinion they're doing pretty good. They seem to be well adjusted. They definitely have a bond with the foster parent." *Id.* at 119. Hence, Mr. Bell opined that it would be in the best interest of the Children "to remain in the pre[-]adoptive home that they're currently in. *Id.* at 104. In addition, Mr. King testified, "I believe it would be in their best interest to be adopted. *Id.* at 119-20.

Thus, as confirmed by the record, termination of Father's parental rights serves Children's developmental, physical and emotional needs and welfare. While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

We next turn to Father's sixth issue, whether reasonable efforts were made at reunification of Father and the Children. We observe that in his brief Father only presents argument related to reasonable efforts with regard to his discussions of Section 2511(a)(1) and (2). Nonetheless, we note that our Supreme Court has held that Section 6351(f) does not require reasonable efforts as it relates to termination of parental rights. *In re D.C.D.*, 629 Pa. 325, 343-46, 105 A.3d 662, 673-75 (2014).

> [W]hile reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

*Id.* at 346, 105 A.3d at 675. Thus, we find this claim to be without merit.

Lastly, as to Father's ninth issue, Father asserts violations of due process and equal protection. It is well-settled that termination of parental rights implicates a natural parent's Fourteenth Amendment right to due process. *See In the Interest of A.P.*, 692 A.2d 240, 242 (Pa. Super. 1997) (stating that natural parents have a "fundamental liberty interest . . . in the care, custody, and management of their children") (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982)). An individual whose parental rights are to be terminated must be

given due process of law, as the termination of parental rights is a constitutionally-protected action. *See In re Interest of K.B.*, 763 A.2d 436, 439 (Pa. Super. 2000) (citing *Santosky*, *supra*). "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)). Similarly, equal protection requires that "like persons in like circumstances will be treated similarly." *In re Adoption of C.J.P.*, 114 A.3d 1046, 1057 (Pa. Super. 2015) (citing *Markovsky v. Crown Cork & Seal Co.,* 107 A.3d 749, 766 (Pa. Super. 2014).

Father argues that the trial court "committ[ed] errors of law in the proceedings terminating [his] parental rights []," thereby violating his constitutional rights. Father's Brief at 16. While Father asserts that he should have been considered as a reunification resource despite his incarceration, he makes no further allegations.[13] *Id.* As Father participated in the hearing *via* telephone and was represented by counsel, who had the

_____

[13] We observe that Father was not available for consideration as a reunification resource due to his incarceration. His family was, however, considered. *Id.* at 96, 102, 109.

opportunity to present evidence and cross-examine witnesses on Father's behalf, we reject Father's argument.

Based on the foregoing analysis of the trial court's termination of Father's parental rights and change of the Children's permanency goal, we affirm the decrees and orders of the trial court.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/26/2017